# Richmond.

## ED. ZIMMERMAN V. TOWN OF BEDFORD.

### November 16, 1922.

1. CONSTITUTIONAL LAW—*Search Warrant—Sufficiency of Affidavit upon which Search Warrant Issued—Case at Bar.*—In the instant case, a prosecution for violation of the prohibition act, it was objected by accused that the evidence for the Commonwealth was obtained by means of an illegal search warrant, in this that the search warrant was of the character prohibited by section 10 of the Constitution of 1902, and the affidavit therefor did not comply with the requirements of the Virginia statute, chapter 345, Acts 1920, and of section 22 of chapter 388, Acts 1918. The affidavit in question was to the effect that affiant believed accused had in his possession ardent spirits at his house or stable in the town of Bedford, and that "I have watched his place and from the nature of the people going in and out of his premises, I am satisfied he has liquor there."

   *Held:* That the warrant sufficiently complied with the statute law.

2. CONSTITUTIONAL LAW—*Searches and Seizures—Features of General Warrants.*—Features of general warrants of search and seizure which fall within the condemnation of section 10 of the Constitution of 1902 are that they were issued (1) without any evidence of fact furnished previously to the issuance, or (2) they did not designate any specific place to be searched, or any specific thing or person to be seized, or (3) particularly describe the offense claimed to have been committed. Section 10 of the Virginia Constitution itself defines what are the general warrants within its meaning, and that definition contains merely the characteristic features just mentioned.

3. CONSTITUTIONAL LAW—*Searches and Seizures—Facts in Affidavit upon which Search Warrant was Issued—Case at Bar.*—The requirement of chapter 345, Acts 1920, and section 22 of chapter 388, as to the evidence required before the issuance of a search warrant is practically identical and is the same requirement as that in substance contained in the fourth amendment of the Federal Constitution. In the instant case the affidavit contained the material facts constituting the probable cause for the issuing of the warrant and the facts relied on by the Commonwealth as sufficient to have satisfied the officer issuing the search warrant that there was reasonable cause for issuing the warrant, required by the statute of 1918, in that, it

stated that the affidavit was based on the personal observation of the affiant of the place designated and of the nature of the people going in and out of the premises.

4. CONSTITUTIONAL LAW—*Search Warrant—Reasonable and Probable Cause for Issuance.*—Evidence of the existence of probable cause for the issuance of a search warrant is the same thing as evidence of the existence of reasonable cause for such issuance.

5. CONSTITUTIONAL LAW—*Search Warrant—Sufficiency of Affidavit—Affidavit by Stranger.*—A search warrant was issued upon an affidavit that affiant had watched the place of accused "and from the nature of the people going in and out of his premises, I am satisfied he has liquor there." It appeared from the evidence that affiant was a stranger in the town and had only been there two days prior to the swearing out of the warrant, and it was contended that this rendered the affidavit worthless as evidence.

   *Held:* That these facts, if true, merely partially affected the weight to be given to and did not entirely destroy this evidence.

6. CONSTITUTIONAL LAW—*Search Warrant—Sufficiency of Evidence upon which Issued.*—The evidence upon which the issuance of a search warrant is based under chapter 345, Acts 1920, and section 22 of chapter 388, does not have to be sufficient to establish the fact that the thing sought is on the premises, but merely that the belief of the person making the affidavit that it is there is based on facts which furnish a probable or reasonable cause for such belief.

7. INTOXICATING LIQUORS—*Authority of Town to Adopt Ordinance Forbidding the Keeping or Storing for Sale of Intoxicating Liquors.*—Section 4617 of the Code of 1919 confers authority upon a town to adopt an ordinance forbidding the keeping or storing for sale ardent spirits and providing punishment for the violation of the ordinance.

8. INTOXICATING LIQUORS—*Town Ordinances—Right of Town to Adopt Ordinance—Amendment of Existing Charter—Case at Bar.*—In the instant case it was contended that to hold that section 4617 of the Code of 1919 conferred authority on a town to adopt an ordinance prohibiting the keeping or storing for sale ardent spirits was to hold that the existing charter of the town could be amended by general legislation, which it was contended was forbidden by section 117 of the Constitution of 1902.

   *Held:* That there was a two-fold error in this position. In the first place, for the legislature, by general law, merely to confer upon towns powers in addition to their charter powers, does not amend their charters. Secondly, section 117 of the Constitution expressly provides that general laws for the organization and government of cities and towns shall be enacted by the General Assembly.

9. INTOXICATING LIQUORS—*Prima Facie Presumption of Guilt from Possession—Explanation of Possession—Other Evidence of Guilt Besides Possession—False Testimony of the Accused—Case at Bar.*—In the instant

case accused was convicted of a violation of the prohibition act and it was urged in behalf of accused that the *prima facie* presumption of guilt, which would have arisen from the unexplained possession by the accused of nine pints of brandy, did not arise because the Commonwealth's own evidence of the possession, disclosing the declaration of the accused, which explained that the possession was for the use of his wife, and the uncontradicted evidence for the accused to the same effect, repelled such *prima facie* presumption.

*Held:* That while this position would doubtless have been sound if the Commonwealth had introduced no other evidence than that showing the possession of the brandy, it did not apply to the instant case because the Commonwealth did introduce other evidence, and in view of that evidence and what the trial judge, sitting as a jury, must have regarded as the false testimony of the accused, the conviction did not rest upon the *prima facie* presumption from the possession of the brandy.

Error to a judgment of the Circuit Court of Bedford county.

*Affirmed.*

In this case the accused was tried before the mayor of the town of Bedford upon a warrant charging him with having on July 9, 1921, ardent spirits stored for sale in his residence in such town, contrary to the town ordinance on that subject, adopted July 29, 1920, which was in force on and after August 15, 1920. The judgment of the mayor found the accused guilty as charged and imposed upon him a fine of $50.00 and thirty days confinement in jail. Upon appeal to the Circuit Court of Bedford county, the case was tried by that court, without the intervention of a jury, resulting in an affirmance of the decision appealed from and in a judgment of the circuit court imposing upon the accused the same punishment aforesaid of a fine of $50.00 to be paid to the town of Bedford and thirty days confinement in the jail of the town, and costs; and it is the latter judgment which is under review.

There were in this case an affidavit for a search warrant, a search warrant and the officer's return upon the latter, as follows:

*"Affidavit for Search Warrant.*

"I, R. E. Light, do hereby make affidavit that I believe Ed. Zimmerman has liquor or other ardent spirits in his possession (house and stable) on W. Main street, in the town of Bedford, which said ardent spirits are held against the laws. of Virginia and the ordinance of the town of Bedford, Va. I have watched his place and from the nature of the people going in and out of his premises, I am satisfied he has liquor there.

"R. E. Light.

"Subscribed and sworn to before me this the 9th day of July, 1921.

"H. B. Jordan, Mayor."

*"Search Warrant.*

"State of Virginia, County of Bedford, to-wit:

"To J. P. Marshall, sergeant of Bedford, Virginia.

"Whereas R. E. Light, of the said county, has this day made complaint and information on oath before me, H. B. Jordan, mayor of Bedford, Virginia, that he has reason to believe that Ed. Zimmerman has liquor or ardent spirits on his premises or in his possession at his residence and stable on west Main street in the town aforesaid, in the county aforesaid, which said liquor or other ardent spirits are held contrary and against the prohibition laws of the State of Virginia and the ordinances of the town of Bedford, Virginia. These are, therefore, to authorize and require you, in the name of the Commonwealth of Virginia, with necessary aid, to

enter in the aforesaid premises of the said Ed. Zimmerman and there diligently search for the said goods, and if the same or any part thereof be found upon the said search, that you seize and bring the said goods and also the body of the said Ed. Zimmerman before me, to be disposed of and dealt with according to law.

"Given under my hand this the 9th day of July, 1921."

"H. B. Jordan, Mayor."

*"Officer's Return Upon Search Warrant.*

"Executed July 9, 1921, J. P. Marshall, sergeant.

"Executed July 9, 1921, by delivering notice of within warrant upon Ed. Zimmerman at his home and searching the home of Ed. Zimmerman under this warrant, finding there a container with brandy or whiskey with more than one gallon in same and bringing same, together with the person of Ed. Zimmerman, before the mayor of the town of Bedford on said date, immediately after search; also finding another container which appeared to have had whiskey in it.

"J. P. Marshall, Sergeant."

The Constitution of Virginia contains the following:

"Sec. 10. *General warrants of search or seizure prohibited.* That general warrants, whereby an officer or messenger may be commanded to search suspected places without evidence of a fact committed, or to seize any person or persons not named, or whose offense is not particularly described and supported by evidence, are grevious and oppressive, and ought not to be granted."

The only statute law, upon the subject of the issuance of search warrants which is cited and relied on for the accused as in effect when the search warrant was issued in the instant case, is contained in section 4612 of the

Code of 1919 and chapter 345 of the Acts of 1920 (p. 516 *et seq.*). So far as material the provisions of such statute law are as follows:

"Sec. 4612. * * * Every * * * mayor of any * * * town, upon complaint and information given under oath, that any person is * * * keeping or storing for sale * * * ardent spirits contrary to law, or that the affiant has cause to believe and does believe that such ardent spirits * * * kept or stored for sale * * * are in any house * * * contrary to the provisions of this chapter, shall issue his warrant requiring * * * the said house * * * to be searched, * * * and shall, in the same warrant, require the officer to whom it is directed * * * to seize and hold all ardent spirits found therein, also * * * jugs and other appliances apparently used in the * * * keeping or storing such ardent spirits, contrary to law."

Section 1 of Acts 1920, pages 510-517, so far as material, is as follows:

"Section 1. No search warrant shall be issued under any statute whatever which has heretofore been or which may at this session of the General Assembly be enacted, or by reason of the common law, until there is filed with the officers now authorized to issue the same on (an) affidavit of some person reasonably describing the house * * * to be searched, the things to be searched for thereunder, *alleging briefly the material facts constituting the probable cause for the issuance of such warrant* and alleging substantially the offense in relation to which said search is to be made. * * * *No such warrant shall be issued on an affidavit omitting such essentials,* and no general warrant for the search of a house, * * * shall be issued * * *." (Italics supplied.)

We find, however, that section 4612 of the Code was repealed by the prohibition statute approved March 19, 1918 (Acts 1918, chap. 388, pp. 578, 596, *et seq.*), and the provisions thereby enacted in lieu of section 4612 are contained in section 22 of such statute, which, so far as material, are as follows:

"*   *   *   If there be complaint on oath that ardent spirits are being   *   *   *   kept stored or in any manner held, used or concealed in a particular house, *   *   *   in violation of law, the   *   *   *   mayor of any   *   *   *   town to whom complaint is made, if satisfied that there is reasonable cause for such belief, shall issue a warrant to search such house or other place for ardent spirits   *   *   *.

"Every warrant shall be directed to an officer charged with the enforcement of this act and shall command him to search the place designated   *   *   *   and seize such ardent spirits and their containers and other things apparently used in violation of law   *   *   *."

The same chapter of the Code (chapter 184), which contains the aforesaid section 4612, contains also section 4617, the provisions of which, so far as material, are as follows:

"Section 4617.   *   *   *   All   *   *   *   towns of the State of Virginia shall have full power to pass all ordinances (not repugnant to the Constitution and laws of the State) embracing such provisions of this chapter as are applicable and further to prohibit the   *   *   *   keeping or storing for sale   *   *   *   of ardent spirits, and to provide adequate penalties therefor."

Sections 3, 5 and 8 of the ordinance of the town of Bedford aforesaid, so far as material, are as follows:

"3. It shall be unlawful for any person in the town of Bedford to   *   *   *   keep or store for sale   *   *   *   ardent spirits   *   *   *."

"5. Any person who shall violate any of the provisions of sections three and four of this ordinance * * * shall be deemed guilty of a misdemeanor and fined not less than fifty dollars nor more than five hundred dollars, and be confined in jail not less than one nor more than six months * * *."
* * * * * * * * * *

"8. The possession by any person * * * in his home of more than one gallon of distilled liquor * * * at any one time, shall in any proceeding or prosecution under this ordinance, be *prima facie* evidence that such person possessed such distilled liquors * * * for the purpose of sale; * * *."

Under the provisions of its charter contained in Acts 1889–90, pp. 757, *et seq.*, fines which might be imposed under ordinances of the town of Bedford were limited to $30.00 and imprisonment to thirty days. This charter was, however, amended and re-enacted in full by Acts 1912, pp. 371, *et séq.*, so as to make the charter of the town conform, as stated in the act, to the general law on the subject of towns; and the limitation just mentioned was left out of the provisions of the charter.

Section 13 of the charter last named provides that "In addition to the powers conferred by other general statutes, the council of the town shall have" a number of specifically enumerated powers, among which is the power to "preserve peace and good order" in the town; but the power to enact such an ordinance as that involved in the case is not specifically given.

Upon the trial in the circuit court, the following testimony was introduced in behalf of the Commonwealth (along with other testimony not material to be mentioned):

Testimony of J. P. Marshall, sergeant of town of Bedford.

"I took search warrant given me by H. B. Jordan, mayor, and got Mr. P. O. Nance and Mr. Harlow to go with me to search the house of Ed. Zimmerman, on Main street, Bedford.    I went to the front door, knocked and Mr. Zimmerman came to the door.    I told him I had a warrant to search his house for ardent spirits or whiskey.    He said 'all right, come in.'    I said 'open this door on the right.'    He opened the door and said 'come in.'    I went over in the corner, opened a box in old trunk and found nothing.    I asked him to open that wardrobe, and he said 'I will have to go and get the keys.'    He went across the hall and I heard him call to his wife and say:  'Give me the keys to the wardrobe.'    He came back.    I insisted on seeing in the wardrobe.    He opened the door and said:    'I think you will find a little brandy in here that I keep for my wife's own use, which I have had since the State went dry, and that I got from Jim Gray.'    He opened the door and I found a glass jug, which turned out to contain nine pints of brandy, which I took and turned over to Mr. Nance, a deputy sheriff.    I went out of that room into an adjoining room, which I searched and found nothing.    I went from that room up the stairs, on third story into a room and also searched and found nothing.    Then I went in room on west side of house, in a room leading into bath room and found by a tin sink a five gallon jug that appeared to have recently been washed out, and it smelled as if there had recently been whiskey in it; sink also smelled of whiskey, and the room smelled of liquor.    I say this because I stuck my fingers into the mouth of the jug and they smelled of whiskey, the sink and the whole room also smelled strongly of whiskey.    I examined the sink closely.    Then I went into a room, which was the bath room, and searched there and found nothing.    I went down into the basement, the first story,

found nothing but empty containers which showed that they had recently had whiskey in them.   I went from there to the barn and searched both stables and found nothing.   I placed Mr. Zimmerman under arrest and locked him up."

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*

Mr. Pete O. Nance.

"I stayed in the hall while Mr. Marshall searched the rooms on second floor.   Mr. Zimmerman came out on right hand side of hall and called to his wife for keys to the wardrobe; he got the keys and I also saw him talking to his wife but do not know what he said:   Mrs. Zimmerman and her son turned and went back upstairs.   Mr. Marshall brought out a five-gallon glass container with nine pints of brandy or whiskey in it and told me to watch it, which I did all the time.   Mrs. Zimmerman ran up the steps and met one of the boys coming down and told him something, I don't know what, and he wheeled back and ran up the steps. Everything appeared to be in quite a commotion on the third floor, sounded like people running around up there.   I stayed by the whiskey all the time and no one had a chance to fool with it.   I did not go with Mr. Marshall to search third floor.   I do not know whether the commotion I heard was more than the ordinary in a boarding house."

The testimony for the accused, so far as material, was as follows:

Mr. Ed. Zimmerman testified "that Mrs. Zimmerman met officers at the door, who told her that they had come to search Mr. Zimmerman's house.   Mr. Zimmerman was called and told officers that they would find some brandy in room on right of hall in wardrobe, and that there was no other brandy or whiskey in the house, that Mr. Marshall found container as he told

him, and that that was all that was found.    Mr. Marshall then went in adjoining room and searched that room over his protest because it was occupied by a roomer named Coleman, who was away at work. *  *  *  He searched room and suit case of Coleman and found nothing; he then went across hall to room and in that room found a five-gallon jug by a tin sink in the corner of the room by a window facing west. This jug Mrs. Zimmerman used to keep buttermilk in and is the same jug that Mr. Marshall testified that he found on the third floor by a tin sink.    Mr. Zimmerman testified that there was no tin sink on the third floor and that the only water on that floor was in the bath room, and that the place that Marshall found the jug was on the second floor.  *  *  *  Mr. Marshall searched the rest of premises and found nothing.    Mr. Zimmerman testified that he had brandy there for the use of his wife, and had gotten seventeen gallons of the brandy before the  State went dry from W. B. Gray. My wife had used brandy or whiskey ever since she was a girl, when sick, and subject to cramping spells and used it to rub externally with when she had rheumatism. Dr. Johnson told her about five years ago to use brandy, and it would save her a doctor's bill, and would be better than a hyperdermic.    He testified that he had brandy there solely for medicinal purposes for his wife and had sold none nor given none away, and that there was no whiskey poured out of jug that Mr. Marshall found, that his wife ran a boarding house and that the jug was used to put buttermilk in for the boarders, that the only tin sink in the house except in basement is in room on second floor in a corner by a window, and that this was the place where Mr. Marshall found jug. *  *  *.

"That R. E. Light, who made affidavit upon which

search warrant was issued, was a stranger in town and had only been here two days prior to swearing out warrant. He never came to my house and did not know the people who boarded there or came there."

Dr. E. L. Johnson testified "that he had been Mrs. Zimmerman's physician for a number of years and that he advised her to take whiskey or brandy when sick and subject to cramping spells, that it would relieve her and would be better than a hyperdermic and would save her a doctor's bill, advised her to apply it externally for rheumatism, which she did on several occasions."

Mary Jordan, colored, said "that she had waited on Mrs. Zimmerman and had used brandy frequently to bathe her in when she had rheumatism; that also she had given it to her internally when sick and subject to cramping spells."

Mr. W. B. Gray testified "that he ran a licensed distillery before the State went dry and that his books show that at a time before the State went dry he sold seventeen gallons of apple brandy to Mr. Zimmerman. Mr. Gray examined brandy and said that he could not swear that he had sold Mr. Zimmerman that brand, but that it may have been brandy which he sold him before the State went dry."

*W. R. Saunders* and *Kemp, Barksdale & Abbot,* for the plaintiff in error.

*J. C. Brown,* for the defendant in error.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

So far as material to the decision, the questions raised by the assignments of error will be disposed of in their order as stated below.

The evidence for the Commonwealth, consisting of the nine pints of brandy and the container which appeared to have had whiskey in it, obtained by means of the execution of the search warrant, and the testimony for the Commonwealth of the officers on the subject of what they saw and heard while executing the search warrant, was, in the trial court and is before us, all objected to on the part of the accused on the grounds that it was obtained by means of an illegal search warrant, in this, that the search warrant is of the character prohibited by section 10 of the Virginia Constitution, and that the affidavit therefor does not comply with the requirements of the statute law of Virginia on the subject.

If these positions were well taken it would be necessary for us, in view of other assignments of error, to further consider whether the illegality of the method by which the evidence in question was obtained, or the provisions in section 8 of the Virginia Constitution, to the effect that no man "shall be compelled in any criminal proceeding to give evidence against himself," rendered the evidence inadmissible against the accused. But as in our opinion, which will be presently more specifically set out, the positions first above referred to are not well taken, it will be unnecessary for us to enter upon the further consideration mentioned.

We shall therefore first take up for decision the question:

[1-4] 1. Is the search warrant involved in the instant case a general warrant of search or seizure prohibited by section 10 of the Virginia Constitution; or one which does not comply with the requirements of the Virginia statute, chapter 345, Acts 1920, and of section 22 of chapter 388, Acts 1918, with respect to the affidavit on which it was issued?

The question must be answered in the negative.

What are the "general warrants" of search or seizure forbidden by the section of the Virginia Constitution mentioned, the history of occurrences in the American Colonies and in England during the eighteenth century, in the matter of the issuance and execution of search warrants, discloses.   Among those occurrences were the following:

In the Colonies writs of assistance to revenue officers were issued empowering them, *in their discretion,* to search suspected places for smuggled goods.   In England the Secretary of State, Lord Halifax, issued a warrant, directed to four messengers, to apprehend and seize the printers and publishers of a paper called the "North Briton," *without any information or charge* laid before the Secretary of State *previously to the issuance of the warrant,* and *without naming any person whatsoever in the warrant.*   These proceedings gave rise to great public dissatisfaction, to debates and resolutions in the House of Commons, and to decisions of court condemnatory of "general warrants." *Money et als* v. *Leach,* 3 Burr. 1766; *Huckle* v. *Money,* 2 Wils. Rep. 205; *Entick* v. *Carrington et als,* 19 How. St. Trials 1029; *Boyd* v. *U. S.,* 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed. 749-751.   As said by Lord Mansfield, in *Money et als* v. *Leach:* "It is not fit that the receiving or judging of the information should be left to the discretion of the officer.   The magistrate ought to judge and should give certain directions to the officer."   The features of what then became known as "general warrants" of search and seizure and which fell within the aforesaid condemnation of them were that they were issued (1) without any evidence of fact furnished previously to the issuance, or (2) they did not designate any specific place to be searched, or any specific thing or person to be seized, or (3) particularly describe the offense claimed to have

been committed. Section 10 of the Virginia Constitution itself defines what are the general warrants within its meaning, and that definition contains merely the characteristic features just mentioned. Both this provision of the Virginia Constitution and the fourth amendment of the Federal Constitution have the same general object, namely, the prohibition of "general warrants" of search and seizure, but the latter is somewhat more specific in the requirements which it makes essential to the validity of search warrants. There are numerous decisions construing the latter requirements, to the effect that, although the warrant itself need not do so, the evidence upon which the warrant is issued must state specific facts sufficient to show probable cause for the issuance of the warrant; whereas there is no decision of this court, to which we have been cited or of which we are aware, construing the language of the Virginia Constitution under consideration. It may be that with respect to the feature (1), above referred to, the Virginia constitutional provision means to render the search warrant invalid only where it is issued without any evidence of fact whatever on which it is granted, and leaves it to the legislature to provide in the enactment authorizing such warrants what character of evidence is requisite, as, for example, that the warrant may issue "upon complaint and information given under oath   *   *   *   that affiant has cause to believe and does believe" the requisite facts, as was provided in section 4612 of the Code; and not to require the affidavit to state the facts constituting the reasons for such belief, as does chapter 345 of Acts of 1920, or that the complaint on oath shall satisfy the officer issuing the warrant that there is reasonable cause for such belief, as does the aforesaid statute of 1918. The requirement of these two statutes in the particular under consideration

is, however, practically identical, and is the same requirement as that, in substance, contained in the fourth amendment to the Federal Constitution. That being so, and in view of the contents of the affidavit in the instant case, it is unnecessary for us to decide whether there is any difference between the requirements of the Virginia and Federal Constitutions in the particular just mentioned. The affidavit contains "the material facts, constituting the probable cause" for the issuing of the warrant, required by the statute of 1920 and the facts relied on by the Commonwealth as sufficient to have satisfied the officer issuing the search warrant that there was "reasonable cause" for issuing the warrant, required by the statute of 1918, in this: It states that the affidavit is based on the personal observation of the affiant of the place designated and of the nature of the people going in and out of the premises. And these facts are in their character convincing evidence of the existence of probable cause (which is the same thing as reasonable cause) for the issuance of the search warrant.

[5, 6] It is urged that in view of the testimony of the accused that R. E. Light, who made the affidavit, was a stranger in town and had only been there two days prior to swearing out the warrant, and had never come to the house of the accused and did not know the people who boarded or came there, rendered the affidavit worthless as evidence. We do not think so. These facts, if true, merely partially affected the weight to be given to and did not entirely destroy this evidence. One who is a close observer of such matters may be very reliable as to conclusions drawn from personal observation for two days of those going in and out of premises, although he may not know personally the persons observed. The evidence on which the issuance of a search warrant is based, under the 1920 and 1918 statutes aforesaid, does

not have to be sufficient to establish the fact that the thing sought is on the premises, but merely that the belief of the person making the affidavit that it is there is based on facts which furnish a probable or reasonable cause for such belief.

The next question for our decision raised by the assignments of error is this:

[7, 8] 2. Did the town of Bedford have the authority to adopt the ordinance under which the conviction was had in this case, so as to make the ordinance valid?

Section 4617 of the general law conferred the authority upon the town to adopt the ordinance, so that the question must be answered in the affirmative.

The position is taken in argument for the accused that to so hold is to hold that the existing charter of the town has been amended by general legislation, whereas it is contended that section 117 of the Virginia Constitution "prohibits the amendment of existing charters except by special legislation." There is a two-fold error in this position. In the first place, for the legislature, by general law, merely to confer upon towns powers in addition to their charter powers, does not amend their charters. Secondly, section 117 of the Constitution expressly provides that *"general laws for the* organization and *government of* cities and *towns shall be enacted* by the General Assembly   *   *."   (Italics supplied.)

But one other question raised by the assignments of error remains for our decision, and that is this:

[9] 3. Was there sufficient evidence to support the conviction of the accused of the offense of having in his possession ardent spirits for the purpose of sale?

The question must be answered in the affirmative.

It is urged in behalf of the accused, with much force, upon the authority of *Neal's Case,* 124 Va. 842, 98 S. E. 629, that the *prima facie* presumption of guilt which

would have arisen under the ordinance from the unexplained possession by the accused of the nine pints of brandy, did not arise in the instant case; because the Commonwealth's own evidence of the possession, disclosing the declaration of the accused, which explained that the possession was for the use of his wife, and the uncontradicted evidence for the accused to the same effect, repelled such *prima facie* presumption.

And this position would doubtless be sound if the Commonwealth in this case had introduced no other evidence than that showing the possession of the brandy. As a matter of fact, however, the Commonwealth did introduce other evidence, namely, the testimony of the officers that there was "found by a tin sink a five-gallon jug that appeared to have been recently washed out and it smelled as if there had recently been whiskey in it; sink also smelled of whiskey, and the room smelled of liquor." That one of the officers "said this," because he stuck his fingers "into the mouth of the jug and they smelled of whiskey, the sink and the whole room also smelled strongly of whiskey." That the officer "examined the sink closely." That he then went down into the basement, and found "empty containers, which showed that they had recently had whiskey in them." And the testimony to the effect that the accused was seen talking to his wife in the hall while the officer who found the brandy was waiting in the room for the keys to the wardrobe therein in which the brandy was; and that the wife and son "turned and went up stairs." That the wife "ran up the steps and met one of the boys coming down and told him something    *    *    and he wheeled back and ran up the steps," etc. Then there was the testimony of the accused denying that any whiskey was poured out of the five-gallon jug aforesaid, and stating that this jug was used for the sole purpose

of keeping buttermilk in it for the boarders, which was false, if the testimony for the Commonwealth was true; and the fact that accused gave no explanation of the empty containers found in the basement, "which showed that they had recently had whiskey in them."

In view of such testimony for the Commonwealth and what the trial judge, sitting as a jury, must have regarded as the false testimony of the accused, and which therefore we must so regard, there was ample evidence to support the conviction in question. The conviction does not rest upon the *prima facie* presumption aforesaid; but finds its support in the affirmative evidence for the Commonwealth and in the legitimate inference of guilt which the trial judge, who heard the witnesses testify, was justified in drawing from what he regarded as the false testimony of the accused.

The judgment under review must be affirmed.

*Affirmed.*